Filed 7/14/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| GINO WILKINS,<br><br>        Plaintiff and Respondent,<br>v.<br><br>CRUISE, LLC, et al.,<br><br>        Defendants and Appellants. | A173832<br><br>(San Francisco City & County<br>Super. Ct. No. CGC25622344) |

Plaintiff Gino Wilkins sued Cruise, LLC and two related General Motors entities (GM) after he was injured during a ride in an autonomous vehicle. At the time, Wilkins was employed by Cruise. But he was not working when he was injured; rather, he was using the ride-hailing service as a Cruise customer. Defendants moved to compel arbitration on the basis of an arbitration provision in Wilkins' employment agreement and an arbitration provision in the Terms of Service to which Wilkins assertedly agreed in connection with his online customer account required to use Cruise ride-hailing services. The trial court denied the motion. We conclude the Cruise user account sign-in wrap agreement to its Terms of Service is enforceable and the "third party" exception allowing for the denial of arbitration set forth in Code of Civil Procedure section 1281.2, subdivision (c) is inapplicable, and therefore reverse.

*Online Contracting Generally*

" ' " '[G]eneral principles of [our state's] contract law determine whether the parties have entered a binding agreement to arbitrate.' " [Citation.] "Mutual assent, or consent, of the parties 'is essential to the existence of a contract' [citations], and '[c]onsent is not mutual, unless the parties all agree upon the same thing in the same sense' [citation]. 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.' " [Citations.]' (*B.D. v. Blizzard Entertainment, Inc.* (2022) 76 Cal.App.5th 931, 943 & fn. 7 . . . (*Blizzard Entertainment, Inc.*).) Put differently, ' "notice—actual, inquiry, or constructive—is the touchstone for assent to a contract." ' (*Blizzard Entertainment, Inc.*, at p. 944.)" (*Cruz v. Tapestry, Inc.* (2025) 113 Cal.App.5th 943, 951, fn. omitted (*Cruz*).)

Basic " 'consent principles apply "with equal force to arbitration provisions contained in contracts purportedly formed over the Internet." [Citations.] "While Internet commerce has exposed courts to many new situations, it has not fundamentally changed the requirement that ' "[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." ' " [Citation.]' (*Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at p. 943.) ' "[W]hen transactions occur over the internet, there is no face-to-face contact and the consumer is not typically provided a physical copy of the contractual terms. . . ." [Citations.] . . . "[I]n

---

[1] Before discussing the salient facts, which are undisputed, we provide a summary of the general law pertinent to contracts assertedly created through the online purchase of goods and services.

order to establish mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting to those very terms when checking a box or clicking on a button." [Citation.]' (*Id.* at p. 944.)" (*Cruz, supra,* 113 Cal.App.5th at pp. 951–952.)

In Internet contracting, "a manifestation of assent may be inferred from the consumer's actions on the website—including, for example, checking boxes and clicking buttons—but any such action must indicate the parties' assent to the *same thing*, which occurs only when the website puts the consumer on constructive notice of the contractual terms." (*Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444, 461 (*Sellers*); accord, *Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 944.)

" 'Most courts . . . have identified at least four types of internet contract formation, most easily defined by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps.' " (*Blizzard Entertainment, Inc.*, *supra,* 76 Cal.App.5th at p. 945, quoting *Sellers, supra,* 73 Cal.App.5th at p. 463; accord, *Cruz, supra,* 113 Cal.App.5th at pp. 954–955.)

" ' "A '*browsewrap*' agreement is one in which an internet user accepts a website's terms of use merely by browsing the site." ' (*Sellers, supra,* 73 Cal.App.5th at p. 463.)  ' " '. . . [A] browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly. . . [.]  [A] party instead gives his assent simply by using the website,' " ' which typically contains a hyperlink somewhere on the page leading to a separate page containing the terms of use to which the owner intends to bind the user. (*Long* [*v. Provide Commerce, Inc.* (2016)] 245 Cal.App.4th [855,] 862 . . . , quoting *Nguyen v. Barnes & Noble Inc.* (9th Cir. 2014) 763 F.3d 1171, 1176

3

(*Nguyen*).) ' "Thus, 'by visiting the website—something that the user has already done—the user agrees to the Terms of Use not listed on the site itself but available only by clicking a hyperlink.' " ' (*Long*, at p. 862, quoting *Nguyen*, at p. 1176.)" (*Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at p. 945.)

A " ' " '*clickwrap*' agreement is one in which an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available." ' " (*Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at p. 945, quoting *Sellers, supra,* 73 Cal.App.5th at p. 463.)

" ' "A '*scrollwrap*' agreement is like a 'clickwrap,' but the user is presented with the entire agreement and must physically scroll to the bottom of it to find the 'I agree' or 'I accept' button. . . ." ' " (*Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at p. 945, quoting *Sellers, supra,* 73 Cal.App.5th at pp. 463–464.)

"Finally, a '*sign-in wrap*' agreement is a 'blend' or ' "hybrid" ' of browsewrap and clickwrap agreements. (*Colgate v. JUUL Labs, Inc.* (N.D.Cal. 2019) 402 F.Supp.3d 728, 763.) ' " '*Sign-in-wrap*' agreements are those in which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up." [Citations.] Instead, "the website is designed so that a user is notified of the existence and applicability of the site's 'terms of use' [usually by a textual notice] when proceeding through the website's sign-in or login process." ' " (*Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at pp. 945–946, quoting *Sellers, supra,* 73 Cal.App.5th at p. 464.)

4

Courts typically enforce clickwrap transactions.  (*Chabolla v. ClassPass Inc.* (9th Cir. 2025) 129 F.4th 1147, 1154 (*Chabolla*); see *Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 946 [observing federal courts generally find "scrollwrap and clickwrap agreements to be enforceable"].)  On the other hand, courts typically decline to enforce browsewrap transactions, in which a website claims that the user has agreed to its terms of use merely by browsing its site.  (*Blizzard Entertainment, Inc.,* at p. 946; *Chabolla,* at p. 1154.)

Sign-in wrap transactions exist "somewhere in the middle: the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." (*Chabolla, supra,* 129 F.4th at p. 1154.)  "Given the present state of California law, website designers who knowingly choose sign-in wrap . . . over clickwrap and scrollwrap designs practically invite litigation over the enforceability of their sites' terms and conditions, as the fact-intensive inquiry over what 'makes a given textual notice sufficiently conspicuous . . . invariably lends itself to a more subjective than objective analysis.' " (*Berman v. Freedom Financial Network, LLC* (9th Cir. 2022) 30 F.4th 849, 868, fn. 4 (*Berman*) (conc. opn. of Baker, J.).)  Nevertheless, a sign-in wrap agreement is enforceable if " '(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.' " (*Keebaugh v. Warner Bros. Entertainment Inc.* (9th Cir. 2024) 100 F.4th 1005, 1014; see, e.g., *Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at pp. 950–951 [sign-in wrap agreement provided "sufficiently conspicuous notice" of license agreement and arbitration provision therein].)

"Although these designations are relevant in assessing whether notice of an agreement is sufficiently conspicuous to bind consumers . . . , 'it is the degree of notice provided, not the label, that is determinative.' " (*Cruz, supra,* 113 Cal.App.5th at p. 954, quoting *Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 950.)

***The Trial Court Arguments and Ruling on the Motion to Compel Arbitration***

In moving to compel arbitration, defendants maintained Cruise's online user agreement was of the sign-in wrap variety. They further asserted that prior to his injury, Wilkins had agreed to the Cruise Terms of Service then in effect, and the arbitration provision therein, by clicking on "an arrow in a conspicuous orange circle" at the bottom of a cell phone screen that provided clear notice of the terms and an obvious hyperlink to review them.

Defendants submitted a copy of the five cell phone screens "of the sign-up process required for riders to obtain access to the Cruise Mobile App during the relevant time period"—the second of which was the pivotal screen referencing the Terms of Service.

The top half of that screen contained a simple line-drawn cartoon of a person holding a document. Immediately underneath, in the middle of the screen, was the following language:

> **"By continuing, you agree to our Terms & Privacy Policy and confirm you are at least 18 years old.**
> "To learn more, please read our Terms of Service and Privacy Policy."[2]

Underneath these two sentences, and at the bottom of the screen, was a very noticeable orange circle with a white arrow in it.

---

[2] "Terms of Service" and "Privacy Policy" were in orange print.

6

Clicking on the circle with the arrow took the user to the next screen which stated at the top:

>"**How would you like to pay?**
>
>"You'll only be charged after your ride."

Under this language there were shaded boxes to be completed with payment information.

Defendants also submitted a copy of the applicable Cruise Terms of Service, printed on 9 1/2 by 11-inch paper, that would have been accessed by clicking on the orange Terms of Service hyperlink. Defendants pointed out that at the bottom of the first of the ten 8 1/2 by 11 inch pages, there were two admonitions in bold: "**Please read this Agreement carefully, as it constitutes a legally-binding contract between you and Cruise**," and "**Please note that Section 5 contains an arbitration agreement and class action waiver that requires you to resolve all claims you may have against Cruise, with some exceptions, in individual binding arbitration. Please read this Section 5 carefully**."

In opposition to the motion, Wilkins argued there "are two types of online agreements"—" 'Clickwrap' agreements' " that "require users to affirmatively click a button or check a box indicating their assent to the terms and conditions before they can proceed" and " 'browsewrap' agreements" which "involve terms posted via a hyperlink" and "do not require any affirmative manifestation of assent from the user." (Fn. omitted.) Asserting "California courts view 'browsewrap' agreements with great suspicion," Wilkins maintained Cruise had presented users with a browsewrap agreement. Wilkins also argued defendants "fail[ed] to introduce the actual alleged agreement" (italics & boldface omitted) and, instead, had provided a copy of the Cruise Terms of Service printed on 8 1/2 by 11-inch

paper, rather than providing screen shots of how the Terms of Service would have looked on a cell phone. Wilkins therefore created and submitted an exhibit depicting how the Terms of Service would have looked on a cell phone screen. This resulted in 31 screens, with the arbitration admonitions appearing on the third screen and the arbitration provision, itself, beginning on the twelfth screen.[3] Wilkins additionally argued the arbitration provision was "ambiguous."

The trial court ruled defendants had failed to satisfy their "burden of showing that plaintiff agreed to the arbitration provisions" in the Cruise Terms of Service, citing solely to *Herzog v. Superior Court* (2024) 101 Cal.App.5th 1280 (*Herzog*). The court called the case "highly instructive" and chastised both parties for not having cited it. "Per the analysis" in that case, the court made a "factual finding" that "continuing with the Cruise sign-up process . . . did not provide a reasonably prudent user with sufficient information to [u]nderstand that he or she was agreeing to anything other than procedures on using a Cruise vehicle and privacy matters."

---

[3] In his respondent's brief, Wilkins argued for the first time that defendants' showing was also deficient in an entirely different respect, namely that they failed to establish what Wilkins saw on his cell phone, or could have seen on his cell phone, when he first signed up for a Cruise account in January 2022. Instead, defendants had focused on what Wilkins would have seen in June 2022, when, according to Cruise records, he agreed to the Terms of Service operative at the time of the May 2023 accident. Wilkins also complained for the first time that defendants' supporting declaration of their attorney with attachments pertaining to June 2022 was based " 'on information and belief.' " Having failed to raise these complaints in the trial court, we deem the belated arguments forfeited. (See *In re D.P.* (2023) 92 Cal.App.5th 1282, 1292 ["a litigant forfeits an appellate argument by failing to raise it before the trial court"]; *Bitner v. Department of Corrections & Rehabilitation* (2023) 87 Cal.App.5th 1048, 1065 ["Having failed to raise or develop this issue in the trial court, plaintiffs cannot raise the issue for the first time on appeal."].)

Alternatively, even if the Terms of Service were enforceable, the court ruled they did not apply to the defendant "GM entities," and therefore arbitration would not be ordered under Code of Civil Procedure section 1281.2, subdivision (c), to avoid inconsistent rulings.[4]

DISCUSSION

**The Cruise Agreement Is a "Sign-in Wrap" Agreement**

We first consider whether this case involves a "sign-in wrap" agreement as defendants maintain, or a "browsewrap" agreement as Wilkins claims. While the appropriate designation is not determinative, it provides, as the case law recognizes, a helpful framework to resolve whether or not the parties created an enforceable online agreement. (See, e.g., *Cruz, supra,* 113 Cal.App.5th at p. 954 [form of agreement is "relevant" but not determinative]; *Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 950 [same].)

Wilkins was incorrect in arguing to the trial court that "there are two types of online agreements." As we have discussed, as the case law in this area has developed, courts have recognized nuances in the context, graphics, and mechanics of online contracting and now recognize four general categories of such contracts. As now characterized by the courts, including two of the leading California cases on online contracting, the Cruise agreement is best described as a sign-in wrap agreement. (See *Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at pp. 944–946, 950; *Sellers, supra,* 73 Cal.App.5th at pp. 463–466.)

Elaborating further, " '[s]ign-in wrap agreements . . . include a textual notice indicating the user will be bound by the terms, but they do not require

---

[4] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

9

the consumer to review those terms or to expressly manifest their assent to those terms by checking a box or clicking an "I agree" button.  Instead, the consumer is purportedly bound by clicking *some other* button that they would otherwise need to click to continue with their transaction or their use of the website—most frequently, a button that allows the consumer to "sign in" or "sign up" for an account.  Thus, it is not apparent that the consumer is aware that they are agreeing to contractual terms simply by clicking some other button.  Instead, "the consumer's assent is 'largely passive,' " and *the existence of a contract turns " 'on whether a reasonably prudent offeree would be on inquiry notice of the terms at issue.' " ' "* (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 946, quoting *Sellers, supra,* 73 Cal.App.5th at p. 471.)

"The *Sellers* court observed that federal courts have generally upheld sign-in wrap agreements, 'perhaps in part because the transactions at issue in [those] cases . . . mostly involve a consumer signing up for an ongoing account and, thus, it is reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship.' (*Sellers, supra* 73 Cal.App.5th at p. 471.)  But, beyond this commonality, the *Sellers* court noted 'some important limitations of the current state of the law in these federal cases.' " (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 946, quoting *Sellers,* at p. 472.)

"First, '[b]ecause the threshold issue of the existence of a contract is for the courts to decide, the issue of conspicuousness is typically characterized as a question of law.' (*Sellers, supra*, 73 Cal.App.5th at p. 473.)  But in deciding this issue, courts are actually undertaking 'a fact-intensive inquiry' of 'largely subjective' criteria, such as the size, color, contrast, and location of any text notices; the obviousness of any hyperlinks; and overall screen 'clutter.' (*Ibid.*)

Not surprisingly, then, the *Sellers* court observed that different federal courts have reached 'seemingly inconsistent results' (*ibid.*) about the conspicuousness of 'essentially the same . . . sign-up webpages' (*id.* at p. 474, citing *Metter v. Uber Technologies, Inc.* (N.D.Cal., Apr. 17, 2017, No. 16-CV-06652-RS) 2017 WL 1374579, at p. *3 [finding Uber's sign-in wrap sufficiently conspicuous] and *Cullinane v. Uber Technologies, Inc.* (1st Cir. 2018) 893 F.3d 53, 63 [finding Uber's sign-in wrap *not* sufficiently conspicuous])." (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at pp. 946–947.)

"Second, the *Sellers* court noted that, because the 'courts have relied on similarly, subjective views about the experience, knowledge, and skill level of the "typical" online consumer' (*Sellers, supra*, 73 Cal.App.5th at p. 474), 'it is more appropriate to focus on the providers, which have complete control over the design of their websites and can choose from myriad ways of presenting contractual terms to consumers online' to 'eliminate any uncertainty as to the consumer's notice of contractual terms and assent to those very terms' (*id.* at pp. 475–476)." (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 947.)

"In this respect, 'the transactional context is an important factor to consider and is key to determining the expectations of a typical consumer.' (*Sellers, supra*, 73 Cal.App.5th at p. 481.) Thus, 'when the transaction is one in which the typical consumer would not expect to enter into an ongoing contractual relationship,' such as buying a single flower arrangement or pair of socks, downloading free software, or signing up for a free trial, the consumer 'is less likely to be looking for' contractual terms. (*Id.* at p. 476. . . .) 'By contrast, the majority of the federal cases finding an enforceable sign-in wrap agreement involve continuing, forward-looking

11

relationships.'  (*Sellers*, at p. 476; see, e.g., *Meyer v. Uber Technologies, Inc.* (2d Cir. 2017) 868 F.3d 66, 80 (*Meyer*) ['The registration process clearly contemplated some sort of continuing relationship between the putative user and Uber, one that would require some terms and conditions, and the Payment Screen provided clear notice that there were terms that governed that relationship.'].)"  (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 947.)

### *A Reasonably Prudent User Would Have Been on Inquiry Notice of the Cruise Terms of Service*

We turn now to whether Cruise's sign-in wrap agreement provided sufficiently conspicuous notice of the Terms of Service to create an enforceable agreement.

" 'To be conspicuous, [the] notice "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." ' "  (*Chabolla, supra,* 129 F.4th at p. 1155.) Doing so involves an inquiry related to the visual aspect of the notice (including a review of the " 'font size, text placement, and overall screen design' ") as well as the " 'context of the transaction.' "  (*Ibid.*)  "The nature of the service or goods offered and the visual aspects of every page of a multi-page transaction should be considered together."  (*Ibid.*; see *Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at pp. 950–954.)  And in that regard, " '[w]ebsite users are entitled to assume that important provisions— such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print.' "  (*Cruz, supra,* 113 Cal.App.5th at p. 952, quoting *Berman, supra,* 30 F.4th at p. 857.) Because online providers have complete control over the design of their

websites, the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.  (See *Cruz,* at p. 952.)

" '[A] webpage must take steps "to capture the user's attention and secure [his or] her assent [to the terms at issue]," ' instead of utilizing a design that 'draw[s] the user's attention away from' notice of those terms. (*Berman*, [*supra,* 30 F.4th] at p. 857; see *id.* at p. 858 [noting that a website must 'adequately call to [the consumer's] attention . . . the existence of the terms and conditions'].)" (*Cruz, supra,* 113 Cal.App.5th at p. 952.)  There is "no bright-line test for finding that a particular design element is adequate in every circumstance.  [Courts] must instead consider how those design elements appear on the page." (*Chabolla, supra,* 129 F.4th at pp. 1156–1157.)

In short, because " ' " 'the consumer's assent [to a sign-in wrap agreement] is "largely passive," ' . . . *the existence of a contract turns ' "on whether a reasonably prudent offeree would be on inquiry notice of the terms at issue." ' "* [Citation.]' (*Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at p. 946.)" (*Cruz, supra,* 113 Cal.App.5th at p. 955.)

As we have recited, in concluding Cruise's sign-in wrap agreement was not enforceable, the trial court relied solely on *Herzog.*  *Herzog* is not, however, the "highly instructive" authority the trial court perceived it to be.

To begin with, while the trial court assertedly made a "factual finding" that "continuing with the Cruise sign-up process . . . did not provide a reasonably prudent user with sufficient information to [u]nderstand that he or she was agreeing to anything other than procedures on using a Cruise vehicle and privacy matters," whether Cruise's sign-in wrap process bound users to the Terms and Conditions is a legal question we consider de novo. (*Cruz, supra,* 113 Cal.App.5th at pp. 953–954; *Blizzard Entertainment, Inc.,*

13

*supra,* 76 Cal.App.5th at p. 949 [" 'Where . . . the trial court denies a petition to compel arbitration based on the threshold issue of the existence of a contract, and the evidence of the alleged contract formation consists primarily of undisputed screenshots of the website at issue, our review is de novo.' " Quoting *Sellers, supra,* 73 Cal.App.5th at p. 462.].)

      *Herzog* also involved significantly different facts and employed an ambiguity analysis not applicable here. Specifically, the *Herzog* court considered a "clickwrap" agreement associated with the launch of an app for online glucose monitoring that could be, but was not required to be, used in conjunction with a blood glucose monitoring device a customer would previously have purchased. (*Herzog, supra,* 101 Cal.App.5th at pp. 1286, 1288.) Before launching the app, the purchaser had to set up an online account with the manufacturer of the device. (*Id.* at p. 1289.) To launch the app, the user was required to provide their username and password and then click the " 'Login' " button. (*Ibid.*) The next screen, titled " 'Legal,' " contained a paragraph of language followed by two boxes, one adjacent to the phrase " 'I agree to Terms of Use' " and the other adjacent to the phrase " 'I agree to Privacy Policy.' " (*Id.* at pp. 1289–1290.) These phrases were hyperlinked to separate webpages setting forth, respectively, the Terms of Use and the Privacy Policy. (*Id.* at p. 1290.) The two boxes had to be checked (by clicking) in order to click on the " 'Submit' " button immediately below the boxes. But users were not required to click on the hyperlinks before clicking on the submit button. (*Ibid.*)

      The *Herzog* majority did not conclude that the log-in screen or the " 'Legal' " screen were beset with visual distractions, or that the " 'I agree to Terms of Use' " and " 'I agree to Privacy Policy' " language was in too small a font, or in too obscuring a color, to be readily noticeable. Rather, the problem

14

the majority identified was created by the language of the paragraph that appeared just above the two boxes. That paragraph stated:

> " 'You understand and agree that your use of this website or any DexCom Inc. mobile application or software platform for your DexCom continuous glucose monitor is subject to the Terms of Use, Privacy Policy and any other acknowledgements listed below. *By ticking the boxes below you understand that your **personal information, including your sensitive health information, will be collected, used and shared consistently with the Privacy Policy and Terms of Use**. You further understand that **personal information and sensitive personal information** will be stored and processed by DexCom, Inc., and/or its affiliate, SweetSpot Diabetes Care, Inc. in the United States, which may have different **data protection laws** than the country in which you reside.' "* (*Herzog, supra,* 101 Cal.App.5th at p. 1297, boldface added.)

The majority concluded the repeated references to personal information and sensitive health information, and the reference to privacy and data protection laws, rendered the two boxes and adjacent phrases immediately below the paragraph, ambiguous. "A user would have no reason to believe, given the context of the transaction and the content of the text on the 'Legal' screen, that by clicking the checkbox next to 'I agree to Terms of Use' they were entering an agreement that concerned any matters other than the scope of the user's privacy waiver and management of the user's personal information." (*Herzog, supra,* 101 Cal.App.5th at p. 1298; *id.* at p. 1297 ["We cannot conclude that a reasonably prudent user in the position of plaintiffs would understand after reading this text that the Terms of Use were intended to govern any matters other than the scope of the user's waiver of privacy rights and the management of the user's personal information."]; *id.* at p. 1299 [paragraph "told users the agreement they were entering pertained only to the collection, use, sharing, storing, and processing of their personal information, including sensitive personal information and sensitive health

15

information.  By doing so, it limited the scope of users' inquiry notice to those subject matters."].)

The *Herzog* majority also focused on the fact it was not considering the creation of an online account, but instead was considering "the initial launch" of an optional app.  (*Herzog, supra,* 101 Cal.App.5th at p. 1303.)  The app "launch was a transaction separate from the transactions the user had already completed in order to acquire the [monitoring device].  Users would have no reason to anticipate encountering during the app launch new contractual terms governing their use of . . . a device they had already acquired with their medical provider's prescription."  (*Id.* at p. 1300.)

The majority went on to distinguish cases involving "user accounts" that "served as platforms for *recurring financial transactions*—that is, exchanges of money for goods ('Loot Boxes') or services (Uber rides).  (See *Meyer*[, *supra*, 868 F.3d at p.] 80; *Blizzard* [*Entertainment, Inc., supra,* 76 Cal.App.5th] at pp. 936, 950–951. . . .)  Such accounts are 'forward-looking' in the sense that they are created in anticipation of future financial transactions between the consumer and the provider.  Here, [the product manufacturer] produced no evidence users had to enter financial information in order to create a[n] . . . account, or that the . . . account served as a platform for recurring financial transactions between app users and [the company].  The absence of such evidence distinguishes this case from *Meyer* and *Blizzard*."  (*Herzog, supra,* 101 Cal.App.5th at p. 1303.)  "In other words, users were presented with the terms not as part of the . . . account creation process but as part of the app launch process.  This circumstance further distinguishes this case from *Meyer*, in which the acceptance of Uber's terms

16

and conditions was directly linked to account registration."[5] (*Herzog,* at p. 1303.)

The instant case involves an entirely different set of circumstances. Here, we are dealing with the updating of a user account that serves as the platform for recurring financial transactions with Cruise. The sign-in wrap agreement is directly linked to that account. And, most significantly, there is no screen in the Cruise process remotely like the "Legal" screen in *Herzog* that had a paragraph filled with language focusing on privacy concerns which thereby created an ambiguity such that a reasonably prudent user would believe the terms pertained only to "privacy rights and the management of the user's personal information." (*Herzog, supra,* 101 Cal.App.5th at p. 1297.)

We therefore turn to cases less far afield, starting with *Blizzard Entertainment, Inc.* That case involved an online license agreement that users of a video game company's products encountered when they "signed up

---

[5] Justice Irion authored a lengthy dissent. (*Herzog, supra,* 101 Cal.App.5th at pp. 1313–1321 (dis. opn. of Irion, J.).) As she saw it:

"The Legal webpage contains three sentences of text followed by two clearly set out boxes, one next to 'I agree to Terms of Use' and the other next to 'I agree to Privacy Policy,' and below them is a 'Submit' button. (Maj. opn., *ante*, at p. 1290.) The first of the three sentences of text tells the user that use of the G6 App 'is subject to the Terms of Use . . . listed below.' (Maj. opn., *ante*, at p. 1290.) The statements next to the boxes below the text have embedded hyperlinks that, if clicked, take the user to webpages that display the Terms of Use or Privacy Policy. (Maj. opn., *ante*, at p. 1290.) By clicking the hyperlink to the Terms of Use, the user would quickly learn they 'CONTAIN[ ] A MANDATORY ARBITRATION OF DISPUTES PROVISION.' (Maj. opn., *ante*, at pp. 1290–1291 & fn. 3.) I conclude a reasonable user who ticked the box next to 'I agree to Terms of Use' and clicked the Submit button would know that doing so constituted consent to all Terms of Use, including the arbitration provision." (*Herzog, supra,* 101 Cal.App.5th at p. 1319 (dis. opn. of Irion, J.).)

for, downloaded, and used Blizzard's service." (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 935.) The trial court denied the company's motion to compel arbitration, ruling a " 'reasonably prudent user would not have inquiry notice of the agreement' " to arbitrate because " 'there was no conspicuous notice of an arbitration' " provision in any of the license agreements. (*Ibid.*) The Court of Appeal reversed. (*Id.* at p. 936.)

The court "first evaluate[d] 'the full context of the transaction.' " (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 950, quoting *Sellers, supra*, 73 Cal.App.5th at p. 477.) It found significant that the "circumstances 'involve a consumer signing up for an *ongoing* account and, thus, it is reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship' governed by terms and conditions. (*Sellers, . . .* at p. 471. . . .)" (*Blizzard Entertainment, Inc.,* at p. 951.) "This," said the court, was "the type of transaction in which federal courts have generally found sign-in wrap agreements enforceable." (*Ibid.*)

The notice of the license agreement also "was not in 'extremely small print,' lacking contrast, or 'outside the [area] where the consumer's attention would necessarily be focused.' " (*Blizzard Entertainment, Inc., supra*, 76 Cal.App.5th at p. 954, quoting *Sellers, supra,* 73 Cal.App.5th at p. 481.) Nor did the notice "rely on a visually nondescript hyperlink." (*Blizzard Entertainment, Inc.,* at p. 954.)

The court additionally emphasized that the license agreement was "sufficiently conspicuous" by way of a "popup" window that allowed the user to scroll through the entire agreement. (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at pp. 935–936, 951.) In addition to admonitions at the top of the first screen of the popup stating that the Blizzard service could not be

18

used unless the user agreed to the license agreement and that the agreement contained a dispute resolution policy that contained an arbitration provision, there was an admonishment at the bottom of the first screen that by clicking the " 'Continue' button" (which was immediately below) "the user 'acknowledge[d] that [he or she has] read and understood the [license agreement].' " (*Id.* at pp. 935–936.)

The court rejected the plaintiffs' argument that because the Dispute Resolution Policy containing the arbitration provision was not, itself, set forth in the license agreement viewable in the popup, but had to be accessed by clicking on a hyperlink in the popup, the Dispute Resolution Policy and arbitration provision therein were not sufficiently conspicuous to give rise to a binding agreement to arbitrate. (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at pp. 953–954.) The court pointed out the license agreement viewable in the popup "contained a hyperlink directly to the Dispute Resolution Policy. Thus, the incorporated document was only *one* click away, not *two*." (*Id.* at p. 953.) The hyperlink also "stood out in underlined blue text." (*Id.* at p. 954.) In sum, the "popup notice provided sufficiently conspicuous notice that by clicking on the 'Continue' button at the bottom of the popup, the user would be agreeing to all of the terms of the 2018 License Agreement," including the hyperlinked Dispute Resolution Policy and arbitration provision therein. (*Ibid.*)

The court distinguished its earlier opinion in *Sellers*. (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at pp. 947–949, 954.) In that case, the court had considered a sign-in wrap agreement for an online question and answer service. The description of what a user saw on a laptop or cell phone was generally the same. The pertinent webpage, for example, stated in fairly large white print against a dark background, " 'Join for $5

19

and get your answer in minutes.'" (*Sellers, supra,* 73 Cal.App.5th at pp. 453–454.) Below, in smaller print, it said: "'Unlimited conversations with doctors—try 7 days for just $5. Then $46/month. Cancel anytime.'" (*Id.* at pp. 454–455.) Below that was a white box with fields for the user to enter their credit card information and e-mail address. Below those fields was an orange button that said, "'Start my trial.'" Next to the button, the user was told: "'Cancel anytime. [¶] We'll remind you one day before trial ends.'" (*Id.* at p. 455.) Below that button, in very small print in a non-distinguishing shade of gray, there was an additional advisement that read, "'By clicking "Start my trial" you indicate that you agree to the terms of service and are 13+ years old.'" (*Ibid.*) The underlined "'terms of service'" was a hyperlink that would take the user to another webpage with approximately 26 pages of terms, including, among others, a binding arbitration clause. The user was not required to actually view the hyperlinked terms of service in order to begin using the service. Once a user submitted their payment information and clicked on the "'Start my trial'" button (which appeared above the reference to the terms of service), they were automatically enrolled in a recurring monthly membership. (*Ibid.*)

The *Sellers* court found the "sign-in wrap agreement was not sufficiently conspicuous to put consumers on notice of the . . . provider's arbitration provision and class action waiver," given that the plaintiffs "alleged they believed they were paying a one-time fee of $5 to submit a question to an online ' "expert" ' . . . [but] . . . the defendant then enrolled them in a costlier, automatically renewing membership, in violation of California's automatic renewal law (Bus. & Prof. Code, § 17600 et seq.; ARL), which requires ' "clear and conspicuous" disclosures' and ' "affirmative

20

consent" ' to enrollment." (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at pp. 947–948.)

"First and foremost," said the *Blizzard Entertainment, Inc.* court, the transaction in *Sellers* was "governed by the ARL, the sign-in wrap notices 'were not sufficiently conspicuous to bind' the plaintiffs . . . because the notices were 'significantly less conspicuous than the statutory notice requirements governing [the plaintiffs'] underlying [ARL] claims. . . .' " (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 948.)

"Second, . . . the *Sellers* court found the sign-in wrap notices were 'not sufficiently conspicuous even when considering the more subjective criteria applied in the more recent federal cases' [citation] because the 'context of the transaction'—clicking a ' "Start my *trial*" ' button to 'get the answer to a *single* question for a *one-time* fee of $5' [citation]—'is not a situation in which "[t]he registration process clearly contemplated some sort of continuing relationship . . . that would require some terms and conditions" ' [citation]. Rather, in [the context at issue in *Sellers*], consumers 'would not likely be scrutinizing the page' for notices regarding terms of use, which were disclosed (1) 'in extremely small print' that contrasted less against the background than other print on the same page; (2) outside the 'box containing the payment fields where the consumer's attention would necessarily be focused'; and (3) via a hyperlink that, although underlined, was 'not set apart in any other way . . . , such as with blue text or capital letters.' " (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 948, quoting *Sellers, supra,* 73 Cal.App.5th at pp. 480–481.)

Third, explained the *Blizzard Entertainment, Inc.* court, the *Sellers* court also found an additional disclosure contained on a " 'View response' page, that appear[ed] 'only *after* the user ha[d] already signed up for a "trial"

21

. . . not sufficiently conspicuous." (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 948.) In contrast to the highly visible " 'View response' " prompt bar the user would click, there was a checkbox next to text stating, " 'I agree to the <u>Disclaimer and re-agree to the Terms of Service</u>.' " (*Id.* at p. 456, quoting *Sellers, supra,* 73 Cal.App.5th at pp. 456, 482.) Although this disclosure was "somewhat more like a clickwrap agreement that is generally enforceable," it was insufficiently conspicuous because the underlined hyperlink "goes to a set of disclaimers regarding the accuracy of the answer the user is about to receive, and *not* to the terms of service." (*Sellers,* at pp. 482–483.) Not until the bottom of the accuracy-disclaimer page was there a link to the terms of service. In short, " 'the entire scenario,' " said the *Blizzard Entertainment, Inc.* court, " 'require[d] the user "to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." ' " (*Blizzard Entertainment, Inc.,* at p. 949, quoting *Sellers,* at p. 483.) Indeed, the hyperlink did not even " 'take the consumer to terms advising them they would be bound by an agreement to arbitrate. Instead, the terms [were] available only if the consumer scrolls through the disclaimers and clicks on a secondary link to the terms of service.' " (*Blizzard Entertainment, Inc.,* at p. 949, italics omitted.)

Contextual concerns and visual obfuscation similar to those in *Sellers* lead to the same result in *Cruz, supra,* 113 Cal.App.5th 943. In that case, the court considered a sign-in wrap agreement in a woman's apparel website. After citing extensively to *Blizzard Entertainment, Inc.* and applying the analytical framework set forth therein—namely, considering the context of the transaction and then the visual aspects of the pertinent screens—the court concluded shoppers were not provided sufficient notice "that purchasing

22

the merchandise would give rise to an ongoing relationship with appellants governed by extensive contractual terms." (*Id.* at p. 948.)

The *Cruz* court first considered the " ' "transactional context" ' " because it " ' "is key to determining the expectations of a typical consumer." ' " (*Cruz, supra,* 113 Cal.App.5th at p. 955, quoting *Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 947.) The plaintiff had simply purchased apparel, akin to purchasing a " 'single flower arrangement,' " and thus was " ' "less likely to be looking for" contractual terms.' " (*Cruz,* at pp. 955–956.) The court rejected the defendants' argument that the plaintiff should have expected such a relationship because she purchased " 'expensive apparel items sight unseen' " and would have anticipated a potential return. (*Id.* at p. 956.) This, said the court, "misapprehend[ed] the nature of the inquiry into the transactional context. Courts focus on whether the typical consumer completing the transaction would ' "anticipate . . . enter[ing] into an ongoing relationship governed by extensive contractual terms." ' . . . An online purchase of merchandise does not necessarily give rise to a consumer expectation of an ongoing relationship governed by extensive contractual terms. [Citation.] Indeed, one would expect the purchase of a single flower arrangement or pair of socks to be subject to a return policy as well, yet, as noted above, they are examples of transactions in which a typical consumer would not expect to be entering into such a relationship with the seller." (*Ibid.*)

The *Cruz* court next focused on the visual aspects of the website checkout page and in particular the two-column format which "increase[d] the likelihood that a consumer would miss the notice text included in just one of the two columns." (*Cruz, supra,* 113 Cal.App.5th at p. 957.) The court acknowledged the notice text was "just below the action button, both of which

[were] on the bottom of the left column and set apart from the remainder of each checkout page; the notice text [was] capitalized; the phrases 'TERMS OF USE' and 'PRIVACY POLICY' [were] underscored; and the version of the notice text found on the checkout page for pickup orders [was] about three-quarters of the size of the white 'PLACE MY ORDER' text included in the pink action button." (*Id.* at pp. 957–958.) However, "other aspects of the notice text and the action button deemphasized the conspicuousness of the notice text. Specifically, the notice text on the delivery order checkout page was only approximately half the size of the action button's white text; on both checkout pages, the white text of the action button was far easier to see than the gray notice text because the white action button text is against a bright pink background whereas the gray notice text is against an off-white background, requiring the 'reader to squint to discern the notice text's content; and, as the trial court observed, the notice text [was] less than a quarter of the size of the action button." (*Id.* at p. 958.) The notice text was also far "less prominent than many other elements of the checkout pages. . . . Although other parts of the checkout pages also use[d] graphics or text in colors other than gray to draw a consumer's attention to them . . . , those features [were] absent from the notice text." (*Ibid.*)

In sum, "in light of the degree of clutter on the two-column checkout pages and the conspicuousness of the pages' other elements in relation to the notice text," the *Cruz* court rejected the defendants' "assertion that 'given its proximity [to the action button], [the notice text] would be impossible to miss.'" (*Cruz, supra,* 113 Cal.App.5th at p. 959.) Instead, the court concluded the defendants had "designed their checkout pages in a manner that 'draw[s] the user's attention away' from the gray, difficult to read, notice text." (*Ibid.,* quoting *Berman*, *supra*, 30 F.4th at p. 857.) The retailer had

24

"failed" to call attention to the "notice" of the Terms of Use because it was "difficult to read and far less prominent than numerous other visual elements (e.g., graphics and other text) appearing on appellants' cluttered two-column checkout pages." (*Cruz,* at p. 948.)

Cruise's sign-in wrap agreement does not suffer from either the contextual or visual problems that rendered the sign-in wrap agreements in *Sellers* and *Cruz* unenforceable. Here, the context involved the updating of an existing, ongoing account that required signing into the account and moving through varying screens. The courts have repeatedly stated it is "reasonable to expect that the typical consumer in that type of transaction contemplates . . . a continuing, forward-looking relationship" governed by terms and conditions. (*Sellers, supra*, 73 Cal.App.5th at p. 471; accord, *Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 951.)

As far as the visual and graphical aspects of the pertinent screen are concerned, the notification that by "continuing" the user was agreeing to the hyperlinked Terms of Service, "was not in 'extremely small print,' lacking contrast, or 'outside the [area] where the consumer's attention would necessarily be focused.'" (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 954, quoting *Sellers, supra,* 73 Cal.App.5th at p. at 481.)

To the contrary, the pertinent screen contained only two sentences. The first gave explicit notice—that "**By continuing, you agree to our Terms & Privacy Policy and confirm you are at least 18 years old.**"—in highly visible, bold type. The second sentence, immediately below, stated—"To learn more, please read our Terms of Service and Privacy Policy." True, the second sentence was in considerably smaller type than the preceding sentence and was not bolded. Nevertheless, it was readily apparent on the screen, the "Terms of Service" and "Privacy Policy" being in

highly visible orange text. It was also clear there were hyperlinks to two different documents, the Terms of Service and the Policy Privacy, and it took only one click to access either. The button to click to continue and move on to the payment screen was well below the notice and the hyperlinks. And there were no other words or graphical elements on the screen that drew the user's attention away from the notice and the hyperlinks. In short, the screen was wholly *un*cluttered, and any reasonable user would have been aware of the importance of Terms of Service and readily able to review them.

Wilkins asserts the button with the arrow below the notice and hyperlink sentences was "ambiguous [in] meaning," and "an ordinary user" would not have been "alerted to the significance of pressing on the arrow." That is hardly the case. The first sentence in enlarged and bolded type unequivocally stated, "**By continuing, you agree to our Terms & Privacy Policy and confirm you are at least 18 years old.**" And even the least sophisticated user of online services would know the significance of the orange button with the white arrow in it—that by clicking that button, the user was "continuing" with the account process.

We therefore conclude the Cruise sign-in wrap agreement "generally" provided sufficient notice that by continuing to the next screen, the user was agreeing to the hyperlinked Terms of Service.[6] (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 951.)

---

[6] As other courts have observed, courts have reached differing conclusions as to the enforceability of ride-hailing company sign-in wrap agreements. What these cases reveal is the great variance in the language and visual appearance of notifications of terms of service and the accessibility of such through hyperlinks. Accordingly, the results in these cases are *highly* fact-specific and no general pronouncement as to the enforceability of a ride-hailing company sign-in wrap agreement can be made. (See, e.g., *Cullinane v. Uber Technologies, Inc., supra,* 893 F.3d at pp. 55, 63–64 [2012–2014 sign-

26

We next consider whether a reasonable user would, on reviewing the Terms of Service, have had notice of the arbitration provision. (See *Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at pp. 951–952.)

As we have recited, the final two paragraphs of the introductory paragraphs of the Terms of Service included two admonitions. The first, set forth as a separate, one-sentence paragraph, stated: "**Please read this Agreement carefully, as it constitutes a legally-binding contract between you and Cruise**." The second, which followed immediately and was also set forth as a separate, one-sentence paragraph, stated: "**Please note that Section 5 contains an arbitration agreement and class action waiver that requires you to resolve all claims you may have against Cruise, with some exceptions, in individual binding arbitration. Please read this Section 5 carefully**."

Immediately below these two separately set forth sentences was the table of contents, which listed 13 sections, including "5. Dispute Resolution and Arbitration."

In the body of the document, section 5 was easily and readily identified by the heading "5. Dispute Resolution and Arbitration," in the same-sized

in wrap screens of user account highly cluttered and hyperlinks not conspicuous]; *Meyer, supra,* 868 F.3d at pp. 70, 78 [2014 sign-in user account screen not cluttered and language and graphics provided reasonably sufficient notice of terms of use]; *Metter v. Uber Technologies, Inc., supra,* 2017 WL 1374579, at p. *3 [although 2014 sign-in wrap user account screen otherwise provided sufficient notice of terms of service, popup keyboard assertedly blocked terms, raising triable issue as to enforceability]; *Good v. Uber Technologies, Inc.* (2024) 494 Mass. 116, 117–118 [2021 clickwrap user account update that used "blocking screen" gave reasonable notice of terms of use containing arbitration agreement]; *Sarchi v. Uber Technologies, Inc.* (2022) 2022 ME 8 [2016 sign-in wrap user account update did not visually provide sufficient notice of terms of use].)

font as the headings of other sections, and a font slightly larger than that of the text of section 5.  The text of section 5 was in the same-sized font as the text of other sections.  Section 5 was broken into eight subsections, discussing various aspects of dispute resolution and arbitration.  In short, the arbitration provision was not graphically packaged in a way that made it obscure, difficult to read, or appear so dense as to be impenetrable.

Wilkins complains that on a cell phone, the Terms of Service were some 31 screens in length, and the introductory admonitions appeared on the third screen, and the arbitration provision began on the twelfth screen.  In short, Wilkins' complaint is not that the arbitration provision was hard to find in the Terms of Service or that it was visually obscure.  Rather, his complaint is one of impatience—that the user had to actually review the document to see the initial admonitions, the table of contents, and the arbitration provision.  Indeed, he complains it was too burdensome even to scroll to the third screen (i.e., two swipes) to see the initial bolded admonitions, which directed the user to the exact location of the arbitration provision, i.e., section 5.  He cites no case suggesting that such effort is so burdensome an undertaking as to render an online contract inaccessible or indecipherable.  Nor do we agree that it is.

Wilkins additionally maintains the arbitration provision, itself, was "ambiguous," thus foreclosing a "mutual" agreement to arbitrate.  He claims this ambiguity arose from the language of subsections 5.2 (titled "5.2. Arbitration Agreement.") and 5.4 (titled "5.4.  Binding Individual Arbitration.").  Specifically, he points to the first sentence of subsection 5.2 which states:  "In the event we are not able to resolve your concerns informally, either party may initiate a binding arbitration proceeding administered by Judicial Arbitration Mediation Services (JAMS)."  He then

points to the first sentence of subsection 5.4 which states: "YOU AND CRUISE MUTUALLY AGREE TO RESOLVE ANY DISPUTES BETWEEN US EXCLUSIVELY THROUGH FINAL AND BINDING INDIVIDUAL ARBITRATION." Wilkins asserts that subsection 5.2, by using the word "may," indicated arbitration was optional and either party could alternatively file a lawsuit, but subsection 5.4 confusingly attempted to foreclose pursuit of a lawsuit. "This create[d]," says Wilkins, "a patent ambiguity" that must be resolved against Cruise.

What Wilkins has done, however, is selectively read two sentences from two different subsections wholly out of context. Section 5 contained eight subsections. The first subsection, 5.1 (titled "Customer Service"), asked a user who "incur[s] any loss, damage, or injury related to our Services" to contact Cruise and provide relevant information. The next subsection, 5.2 (titled "Arbitration Agreement"), stated at the outset that "[i]n the event we are not able to resolve your concerns informally, either party may initiate a binding arbitration proceeding administered by" JAMS, and in the remainder of the fairly lengthy paragraph, provided further detail as to the required timing and content of a written "notice of dispute." The next subsection, 5.3 (untitled), in its first sentence, directed the user to and provided a link to the JAMS "Arbitration Rules & Procedures" and in the remainder of the lengthy paragraph, provided an overview of the arbitration process. The next subsection, 5.4 (titled "Binding Individual Arbitration"), commenced with the capitalized and bolded language we have recited above. It then went on to state in pertinent part: "Except for disputes described in Section 5.6 below, all disputes arising out of or relating to this Agreement or our Services or any aspect of the relationship between you and Cruise, whether based in contract, tort (including negligence), statute, fraud, misrepresentation or any other

29

legal theory, will be resolved through final and binding arbitration before a neutral arbitrator instead of in a court by a judge or jury. **YOU AGREE THAT CRUISE AND YOU ARE EACH WAIVING THE RIGHT TO TRIAL BY JURY**. . . ." This was followed by four more subsections—"5.5. Class Action Waiver"; "5.6 Exclusions and Limitations"; and 5.7 and 5.8, both untitled. Subsection 5.7 stated "[t]his arbitration agreement" applied "to claims between you and Cruise affiliates" and other associated individuals and entities. Subsection 5.8 stated users could also contact the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Services.

In short, read in its entirety, there was no ambiguity as to whether a user could choose to pursue a lawsuit, rather than initiate an arbitration proceeding. A user could, indeed, choose whether or not to seek recompense for loss, damage, or injury. But if they chose to do so, the arbitration provision was clear the procedural avenue for doing so was through JAMS arbitration.

In sum, we conclude Cruise's account sign-in wrap process provided sufficiently conspicuous notice of the Terms of Service and that the Terms of Service, in turn, provided clear notice of the arbitration provision set forth therein.

### Code of Civil Procedure Section 1281.2, subdivision (c)

The trial court alternatively ruled that even if the Cruise Terms of Service were enforceable against Wilkins, they did "not cover either of the GM entities." It then found there was a "substantial possibility of conflicting rulings in an arbitration proceeding with Cruise and a court proceeding with the GM defendants" and therefore "exercise[d] its discretion per [Code of Civil Procedure section] 1281.2(c) to deny the motion to compel." Defendants

30

maintain the "GM entities" are not "third parties" as that term is understood for purposes of this statutory provision and therefore the trial court had no discretion to deny arbitration. (See *Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 968 (*Aguire II*) ["A trial court has no discretion to deny or stay arbitration unless all three of section 1281.2(c)'s conditions are satisfied."].)

Section 1281.2, subdivision (c) provides in pertinent part:

"On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that: [¶] . . . [¶]

"(c) A party to the arbitration agreement is also a party to a pending court action or special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact. For purposes of this section, a pending court action or special proceeding includes an action or proceeding initiated by the party refusing to arbitrate after the petition to compel arbitration has been filed, but on or before the date of the hearing on the petition. . . ."

" 'As our Supreme Court has explained: " 'Section 1281.2(c) addresses the peculiar situation that arises when a controversy also affects claims by or against *other parties not bound by the arbitration agreement*. The California provision giving the court discretion not to enforce the arbitration agreement under such circumstances . . . avoid[s] potential inconsistency in outcome as well as duplication of effort. . . .' " (*Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 393 . . . , italics added.)' " (*RN Solution, Inc. v. Catholic Healthcare West* (2008) 165 Cal.App.4th 1511, 1520 (*RN Solution*).)

31

This provision does not apply, however, "when all defendants, including a nonsignatory to the arbitration agreement, have the right to enforce the arbitration provision."[7]  (*Laswell v. AG Seal Beach, LLC* (2010) 189 Cal.App.4th 1399, 1405 (*Laswell*); see *Thomas v. Westlake* (2012) 204 Cal.App.4th 605, 612 (*Thomas*) ["As used in section 1281.2, subdivision (c), the term 'third party' means a party to the action that is not bound by or entitled to enforce the arbitration agreement."].)

"[W]hether a defendant is in fact a third party for the purposes of Code of Civil Procedure section 1281.2, subdivision (c), is a matter of law subject to de novo review."  (*Laswell, supra,* 189 Cal.App.4th at p. 1406; see *Thomas, supra,* 204 Cal.App.4th at p. 613 ["To determine which defendants may enforce the arbitration clauses of the agreements . . . , we need only examine those agreements and [the plaintiff's] complaint."].)

*RN Solutions* is illustrative.  In that case, two plaintiffs, a corporation and an individual, sued two defendants, a corporation and an individual.  The plaintiff and defendant companies were "clearly not third parties because they [were] both direct signatories of the arbitration agreement."  (*RN Solution, supra,* 165 Cal.App.4th at p. 1520.)  Although the individual plaintiff signed the contract containing the arbitration agreement, she did so only in her capacity as president and CEO of the plaintiff company.  However, it was alleged she had benefited financially and professionally from the contract between the signatories.  She was therefore "bound by the arbitration agreement both as an agent-employee" of the signatory company and "as a third party beneficiary of" of the contract.  (*Ibid.*, citing *Harris v.*

---

[7] The "third-party exception" also has no application to an arbitration provision governed solely by the Federal Arbitration Act (9 U.S.C. § 1 et seq.). (See *Acquire II, supra,* 213 Cal.App.4th at p. 968.)  The arbitration provision here, however, does not exclude the application of state law.

*Superior Court* (1986) 188 Cal.App.3d 475, 478 [employee of corporation that is party to arbitration agreement is bound by agreement]; *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 81–82 [person who accepts benefits under agreement containing arbitration clause is bound by clause].) As for the individual defendant, the complaint alleged "he was a managing agent and vice-president of human resources within" the defendant signatory company. (*RN Solution,* at p. 1520.) "As such, he [was] also bound by the arbitration agreement and entitled to enforce it." (*Ibid.*, citing *Harris,* at p. 478 and *Dryer v. Los Angeles Rams* (1985) 40 Cal.3d 406, 418 ["[i]f, as the complaint alleges, the individual defendants, though not signatories, were acting as agents for the Rams, then they are entitled to the benefit of the arbitration provisions"].)

"Since all of the parties involved in the [*RN Solution*] lawsuit [were] bound by the arbitration agreement, the fundamental condition for the application of section 1281.2(c)—a pending court action or special proceeding between a party to the arbitration agreement and a third party—[was] absent." (*RN Solution, supra,* 165 Cal.App.4th at p. 1521; see *Thomas, supra,* 204 Cal.App.4th at p. 614 ["when a plaintiff alleges a defendant acted as an agent of a party to an arbitration agreement, the defendant may enforce the agreement even though the defendant is not a party thereto"]; *Rowe v. Exline* (2007) 153 Cal.App.4th 1276, 1283–1285 (*Rowe*) [the defendants alleged to be alter egos of the defendant were not "third parties" under § 1281.2, subd. (c)].)

In *Laswell, supra,* 189 Cal.App.4th 1399, the plaintiff, a senior in a residential care facility, sued three entities for allegedly poor care—"AG Seal Beach, LLC, the licensee and operator of the health facility doing business as Country Villa Seal Beach Healthcare Center [where the plaintiff resided]; AG Facilities Operations, LLC, the owner of AG Seal Beach, LLC, and Country

33

Villa Seal Beach Healthcare Center; and Country Villa Service Corporation, doing business as Country Villa Health Services, the management company of Country Villa Seal Beach Healthcare Center in charge of the day-to-day operation, patient care and maintenance of the health facility (collectively, defendants)." (*Id.* at p. 1402.) The trial court treated the latter two entities, which were not signatories to the arbitration agreement signed by the plaintiff and a representative of the Healthcare Center, as "third parties" under section 1281.2, subdivision (c), and denied the defendants' petition to compel arbitration. (*Laswell,* at pp. 1406–1407.) The Court of Appeal reversed. (*Id.* at p. 1402.)

" '[I]n many cases,' " explained the appellate court, " 'nonparties to arbitration agreements are allowed to enforce those agreements where there is sufficient identity of parties.' " (*Laswell, supra,* 189 Cal.App.4th at p. 1407, quoting *Valley Casework, Inc. v. Comfort Construction, Inc.* (1999) 76 Cal.App.4th 1013, 1021.) In addition, " ' " '[t]he equitable estoppel doctrine applies when a party has signed an agreement to arbitrate but attempts to avoid arbitration by suing nonsignatory defendants for claims that are " 'based on the same facts and are inherently inseparable' " from arbitrable claims against signatory defendants.' " ' " (*Laswell,* at p. 1407, quoting *Rowe, supra,* 153 Cal.App.4th at p. 1287.)

The court then observed that according to the plaintiff's own allegations "all the defendants are related Country Villa entities. AG Seal Beach, LLC, the licensee and operator of the facility doing business as Country Villa Seal Beach Healthcare Center, entered into a management agreement with Country Villa Service Corporation, doing business as Country Villa Health Services, to operate the facility. The arbitration agreement in fact was written on letterhead of Country Villa Health Services.

34

AG Facilities Operations, LLC, is the owner of AG Seal Beach, LLC, and the facility Country Villa Seal Beach Healthcare Center. . . . Further, the substance of [the plaintiff's] allegations [was] that all the defendants [were] responsible for the improper care that she received while she resided at Country Villa Seal Beach Healthcare Center, demonstrating her claims against all defendants are based on the same facts and theory and are inherently inseparable." (*Laswell, supra,* 189 Cal.App.4th at p. 1407.)

The appellate court therefore concluded that "[u]nder these circumstances, AG Facilities Operations, LLC, and Country Villa Service Corporation can enforce the arbitration agreement against [the plaintiff] and thus are not third parties within the meaning of Code of Civil Procedure section 1281.2, subdivision (c)." (*Laswell, supra,* 189 Cal.App.4th at p. 1407; see *Thomas, supra,* 204 Cal.App.4th at p. 614 ["as alleged agents of parties to the agreements containing arbitration clauses" nonsignatory defendants could compel arbitration of the claims against them and were not third parties under § 1281.2, subd. (c)]; cf. *Gamma Eta Chapter of Pi Kappa Alpha v. Helvey* (2020) 44 Cal.App.5th 1090, 1092–1093, 1099 (*Chapter of Pi Kappa Alpha*) [agreement between international fraternity and local chapter members required arbitration of disputes with fraternity or chapter, and also with any entity or individual "affiliated" with fraternity; nonprofit housing corporation created to provide chapter housing, and individual officer thereof, were "affiliated" with fraternity for purposes of arbitration].)

The *Laswell* court went on to point out that the fact the plaintiff had asserted a nonarbitrable claim against one of the entities in an attempt "to avoid arbitration" was unavailing. "A trial court does not have discretion to deny arbitration under Code of Civil Procedure section 1281.2, subdivision (c), absent the presence of a third party, and a plaintiff's inclusion of a

35

nonarbitrable cause of action in the complaint is not grounds to deny arbitration under the third party exception." (*Laswell, supra,* 189 Cal.App.4th at p. 1409.)

Here, the trial court provided no explanation for its conclusion that the instant case is one of those "peculiar situations" (*Cronus Investments, supra,* 35 Cal.4th at p. 393) addressed by the "third-party exception" set forth in section 1281.2, subdivision (c). Nor, as the above-cited cases reflect, is it.

Wilkins named as defendants Cruise LLC, GM Cruise Holdings LLC, and General Motors LLC. According to Wilkins, Cruise LLC was the licensed operator of the autonomous vehicle. GM Cruise Holdings LLC is a Cruise ownership entity. And General Motors LLC manufactured and owned the autonomous vehicle in which Wilkins was a passenger. Cruise LLC, GM Cruise Holdings LLC, and General Motors LLC are owned, in turn, by another entity, General Motors Holdings, LLC.[8]

Wilkins went on to allege that "each named Defendant" was "the owner, agent, servant, employee, or joint venturer of each of the remaining Defendants and was at all times acting within the course and scope of said agency, service, employment, and/or joint venture, and each Defendant has ratified and approved the act for each Defendant." He further alleged that "[a]dherence to the fiction of separate existence of these certain Defendants as an entity distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction fraud and/or promote injustice."

---

[8] We also note the arbitration provision stated it applied "to claims between you and Cruise affiliates, and any representatives, shareholders, employees, agents, contractors, insurance carriers, predecessors and successors in interest, officers and directors of Cruise or its affiliates (individually and collectively 'Cruise Parties'), and such Cruise Parties shall be considered intended third-party beneficiaries of this arbitration agreement."

He then asserted every cause of action—for Common Carrier Liability, Negligence, Negligence Per Se, Negligent Hiring, Training, Supervision, and Retention, Strict Product Liability, Strict Product Liability-Failure to Warn, and Breach of Implied Warranty—"against All Defendants" and alleged the same operative facts as to all defendants.[9] (Boldface omitted.)

In short, like the plaintiffs in *RN Solutions, Laswell,* and *Thomas,* Wilkins' own allegations allow these related entities—Cruise LLC, GM Cruise Holdings LLC, and General Motors LLC—to enforce the arbitration provisions of the Terms of Service against him, and they therefore are not "third parties" for purposes of section 1281.2, subdivision (c). (See *Rowe, supra,* 153 Cal.App.4th at pp. 1284–1285 [nonsignatory defendants alleged to be alter egos of signatory corporate defendant were not "third parties" under § 1281.2, subd. (c)]; *Thomas, supra,* 204 Cal.App.4th at pp. 614, 618 [nonsignatory defendants alleged to have acted as agents of signatory party could enforce arbitration agreement and were not "third parties" under § 1281.2, subd. (c)]; *Laswell, supra,* 189 Cal.App.4th at pp. 1407–1408 [entities related to signatory entity could invoke arbitration agreement where plaintiff's claims against all defendants were inherently inseparable and based on the same facts and theory and therefore were not "third parties" under § 1281.2, subd. (c)]; *RN Solution, supra,* 165 Cal.App.4th at p. 1520 [nonsignatory defendant allegedly acting as agent of signatory company was not a "third party" under § 1281.2, subd. (c)].)

---

[9] There has never been any dispute that these causes of action come within the terms of the arbitration provisions which, as we have noted, apply with limited exceptions not pertinent here to "all disputes arising out of or relating to this Agreement or our Services or any aspect of the relationship between you and Cruise, whether based in contract, tort (including negligence), statute, fraud, misrepresentation or any other legal theory."

Wilkins' only response is that his agency allegations were "purely formulaic" and such "boilerplate agency language . . . cannot override the distinct roles of a vehicle manufacturer (General Motors LLC) versus an autonomous vehicle service provider (Cruise)." To begin with, this a disingenuous argument—a party cannot dismiss their own allegations as meaningless verbiage when the allegations suddenly become inconvenient for them. (See *Thomas, supra,* 204 Cal.App.4th at p. 614 ["Having alleged all defendants acted as agents of one another, [the plaintiff] is bound by the legal consequences of his allegations."].) Furthermore, the fact the three entities he named and sued as agents, joint venturers, and alter egos, had differing roles in facilitating the operation of the autonomous ride-hailing service does not make them "third parties" for purposes of section 1281.2, subdivision (c). (See, e.g., *Chapter of Pi Kappa Alpha, supra,* 44 Cal.App.5th at pp. 1092–1093, 1099 [affiliated entity had different role]; *Laswell, supra,* 189 Cal.App.4th at p. 1407 [related entities had different roles].)[10]

## DISPOSITION

The order denying arbitration is reversed and the matter is remanded for the trial court to grant the motions to compel arbitration. Costs on appeal to defendants and appellants.

---

[10] Given our conclusions that the Cruise Terms of Service and arbitration provisions therein are enforceable and that the third-party exception set forth in section 1281.2, subdivision (c) is inapplicable, we need not, and do not, address any other issues raised, or arguments advanced, by the parties.

_____

Banke, Acting P.J.

We concur:


_____

Langhorne Wilson, J.


_____

Smiley, J.

A173832, Wilkins v. Cruise, LLC et al.

Trial Court: San Francisco City and County Superior Court

Trial Judge: Hon. Joseph M. Quinn

Counsel:

Faegre Drinker Biddle & Reath LLP, John Jospeh Powers and David A. Belcher, for Defendants and Appellants.

Kaufman Law, Casey Aron Kaufman for Plaintiff and Respondent.